**RED WING SHOE COMPANY, INC., Plaintiff–Appellant,**

v.

**HOCKERSON–HALBERSTADT, INC., Defendant–Appellee.**

No. 97–1474.

United States Court of Appeals, Federal Circuit.

June 30, 1998.

Jeff H. Eckland, Faegre & Benson, LLP, of Minneapolis, Minnesota, argued for plaintiff-appellant. With him on the brief was William L. Roberts.

James E. Uschold, James E. Uschold, PLC, of New Orleans, Louisiana, argued for defendant-appellee.

Before RADER, SCHALL, and BRYSON, Circuit Judges.

RADER, Circuit Judge.

Red Wing Shoe Company, Inc. (Red Wing) brought an action against Hockerson–Halberstadt, Inc. (HHI) seeking a declaratory judgment of noninfringement, invalidity, and unenforceability of U.S. Patent No. 4,322,895 (the '895 patent). The United States District Court for the District of Minnesota dismissed the action for lack of personal jurisdiction. *See* 966 F.Supp. 833 (D.Minn.1997). Because Red Wing has not shown that HHI has sufficient contacts with Minnesota to support personal jurisdiction in that forum, this court affirms.

## I.

HHI is a Louisiana corporation with its principal place of business in New Mexico. HHI's sole business is licensing and enforcing the rights associated with two patents, one of which is the '895 patent. The '895 patent claims an athletic shoe which provides improved support and stability for the wearer's heel. HHI, however, does not manufacture shoes or any other product. Red Wing, a Minnesota corporation with its principal place of business in Minnesota, manufactures footwear.

In October 1995, HHI sent a letter to Red Wing at its Minnesota office. In the letter, HHI suggested that several of Red Wing's products infringed the '895 patent. HHI's letter also offered Red Wing a non-exclusive license under the '895 patent. The letter further offered to negotiate license terms and indicated that HHI had already negotiated or was in the process of negotiating licenses with numerous well-known companies such as Adidas, Asics, Brooks, L.A. Gear, Nike, and Reebok. Red Wing responded by letter in December 1995, enclosing copies of Red Wing's product catalogs and requesting an extension of time to consider HHI's letter.

Two weeks later, HHI sent a letter granting Red Wing an extension of time. The letter also asserted that additional products in Red Wing's catalogs also infringed the '895 patent. In March 1996, Red Wing responded to HHI's allegations of infringement. Red Wing's letter analyzed each of the products in question and concluded that none of Red Wing's products infringed. Red Wing enclosed cutaway samples of its products to facilitate comparison with the claims of the '895 patent.

A month later, HHI responded with a rebuttal of Red Wing's infringement analysis. HHI reasserted that Red Wing's products infringed the '895 patent and repeated its offer to extend Red Wing a nonexclusive license based on a lump sum payment or a per unit royalty. In August 1996, Red Wing responded in turn that none of its products infringed the '895 patent and professed no interest in "license negotiations with HHI." A week later, on August 23, 1996, Red Wing filed a declaratory judgment action against HHI in the United States District Court for the District of Minnesota alleging noninfringement, invalidity, and unenforceability of the '895 patent.

HHI moved to dismiss the action for lack of personal jurisdiction. To show that HHI had sufficient "minimum contacts" with Minnesota for personal jurisdiction, Red Wing relied heavily on HHI's three warning letters. Red Wing pointed out that these letters not only sought to inform Red Wing of potential infringement but also solicited business with Red Wing in Minnesota. In addition, Red Wing established that all of HHI's thirty-four licensees sell products in Minnesota. Moreover, six of those licensees

maintain their own retail stores or possess a registration to do business in Minnesota. None of HHI's licensees, however, is incorporated in Minnesota or has its principal place of business in that state. Moreover, HHI has had no dealings with its licensees in that state. HHI exercises no control over the sales activities of its licensees.

The district court determined that it lacked personal jurisdiction over HHI and granted the motion to dismiss. Red Wing appeals.

## II.

■ This court applies the law of the Federal Circuit, rather than that of the regional circuits, to determine personal jurisdiction in a patent infringement case. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564–65, 30 USPQ2d 1001, 1006 (Fed.Cir.1994). This choice of governing law applies as well to personal jurisdiction in declaratory judgment actions that involve patentees as defendants. *See Akro Corp. v. Luker,* 45 F.3d 1541, 1543, 33 USPQ2d 1505, 1506–07 (Fed.Cir.1995). Because the parties do not dispute the jurisdictional facts, the question of personal jurisdiction in this case resolves itself into one of law. *See id.* at 1543.

■ In general, a district court's personal jurisdiction over a non-consenting defendant outside the boundaries of the forum is a two-step inquiry. First, the district court deter-

mines whether a provision makes the defendant amenable to process, which usually depends on whether the defendant "could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district is located." Fed.R.Civ.P. 4(k)(1)(A). Second, the district court ensures that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' " that are embodied in the Due Process Clause.* *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

■ For the first step in this analysis, the district court acknowledged the Minnesota long-arm statute. *See* Minn.Stat. § 543.19 (1988). Minnesota courts have consistently held that this long-arm statute reaches as many extraterritorial defendants as the Due Process Clause will allow. *See, e.g., Domtar, Inc. v. Niagara Fire Ins. Co.,* 533 N.W.2d 25, 29 (Minn.1995); *Valspar Corp. v. Lukken Color Corp.,* 495 N.W.2d 408, 410 (Minn. 1992). Thus, in this case, the two-step inquiry folds into one: whether an exercise of personal jurisdiction over HHI would offend Due Process.

■ To discern the limits of Due Process on the extraterritorial reach of its state statute, the district court properly examined whether HHI had established "minimum con-

---

\* This court has stated that the Due Process Clause at issue for personal jurisdiction in a patent case is that of the Fifth Amendment, and not the Fourteenth. *See, e.g., Akro Corp. v. Luker,* 45 F.3d 1541, 1544, 33 USPQ2d 1505, 1508 (Fed. Cir.1995). In making that pronouncement, this court did not reconcile its statement with the jurisprudence of other circuits. Other circuits have held that a federal court relying on a state statute for extraterritorial service in fact applies the minimum contacts test of the Fourteenth Amendment Due Process Clause. *See, e.g., Lorelei Corp. v. County of Guadalupe,* 940 F.2d 717, 720 (1st Cir.1991). To be sure, a federal court is a federal actor and thus subject to the Due Process Clause of the Fifth Amendment, but some circuits have held that the Fifth Amendment requires only an analysis of contacts with the nation as a whole for personal jurisdiction. *Lorelei,* 940 F.2d at 719; *cf. Panama v. BCCI Holdings (Luxembourg), S.A.,* 119 F.3d 935, 947 (11th Cir.1997) (adopting this standard generally

but with additional flexibility); *see also Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 102 n. 5, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987) (declining to address the issue). However, when a federal court asserts personal jurisdiction based on a state's long-arm statute, *see* Fed.R.Civ.P. 4(k)(1)(A), as opposed to a federal statute or rule, *see* Fed.R.Civ.P. 4(k)(1)(B)-(D) & 4(k)(2), the Due Process Clause of the Fourteenth Amendment also comes into play. Because the Fourteenth Amendment constrains the reach of a state's long-arm statute, it also constrains the reach of a federal court that relies on such a statute. *See Lorelei,* 940 F.2d at 720. In any event, the question of which Due Process Clause controls the personal jurisdiction inquiry becomes purely academic because this court, though professing reliance on the Fifth Amendment, applies the Fourteenth Amendment state-contacts test of *International Shoe. See, e.g., Akro,* 45 F.3d at 1544–49.

tacts" with Minnesota, "such that [it] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The district court also performed the second part of the Due Process inquiry: "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *International Shoe,* 326 U.S. at 320, 66 S.Ct. 154). These factors may serve to "establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id.* at 477, 105 S.Ct. 2174. Likewise, they may also establish a "compelling case" that would "render jurisdiction unreasonable" even though "minimum contacts" are present. *Id.; see also Asahi Metal Indus. Co. v. Superior Ct. of Cal.,* 480 U.S. 102, 121–22, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (Stevens, J., concurring in judgment).

 The "minimum contacts" test examines the number and nature of a defendant's contacts with the forum. In general, when the cause of action at issue "arises out of or relates to" those contacts, a court may properly assert personal jurisdiction, even if those contacts are "isolated and sporadic." *Burger King,* 471 U.S. at 472–73, 105 S.Ct. 2174. Jurisdiction in this situation has the name "specific jurisdiction." In fact, "even a single act can support jurisdiction," so long as it creates a "substantial connection" with the forum, as opposed to an "attenuated affiliation." *Id.* at 475 & n. 18, 105 S.Ct. 2174 (citing *McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)). In contrast, a defendant whose contacts with a forum are "continuous and systematic" may be subject to jurisdiction even when the cause of action has no relation to those contacts. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Jurisdiction in this situation has the name "general jurisdiction." In both situations,

contacts only add to the quantum for personal jurisdiction when purposefully directed at the forum or its residents. "Random," "fortuitous," or "attenuated" contacts do not count in the minimum contacts calculus. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. Similarly, contacts resulting from the "unilateral activity" of others do not count. *Id.* at 475 & n. 17, 105 S.Ct. 2174.

### III.

 Red Wing argues that HHI has sufficient minimum contacts with Minnesota to satisfy Due Process and thus to permit the Minnesota statute to effect personal jurisdiction. According to Red Wing, the three letters that HHI sent to Red Wing in Minnesota are contacts directly related to the declaratory judgment action. Without the assertion of infringement in these letters, Red Wing asserts it would have no cause to seek declaratory judgment at all. Thus, Red Wing argues that the cause of action arises out of HHI's letters. In addition, Red Wing contends that HHI's offers to license the '895 patent amounted to a purposeful effort to negotiate business with a Minnesota resident. On these theories, Red Wing asserts that HHI's three letters alone suffice to show minimum contacts.

Beyond the letters, Red Wing attempts to show minimum contacts based on HHI's licensing activities in Minnesota. HHI has thirty-four licensees who sell products in Minnesota. Six of those licensees have stores or are registered to do business in Minnesota. Red Wing characterizes this as a "34–licensee distribution channel," whereby HHI has "deliberately created a system under which HHI reaps the benefits of foreseeable sales of patented products in Minnesota." Under these circumstances, Red Wing argues, HHI has effectively "deliver[ed] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World–Wide Volkswagen,* 444 U.S. at 298.

As noted above, even a single contact with a forum state may suffice for personal jurisdiction if it is directly and substantially related to the plaintiff's claim. *See McGee,* 355

U.S. at 223, 78 S.Ct. 199. Red Wing's claim here is a request for a declaratory judgment of noninfringement. Correspondingly, the contacts at issue are cease-and-desist letters that charge Red Wing with infringement. Often, the central purpose of a declaratory judgment plaintiff like Red Wing is to clear the air of infringement charges:

> Before the [Declaratory Judgment] Act, competitors victimized by [scare-the-customer-and-run tactics] were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue. After the Act, those competitors were no longer restricted to an *in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests.

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735, 6 USPQ2d 1685, 1688 (Fed.Cir.1988). The injury of which a declaratory judgment plaintiff complains, then, is a wrongful restraint on the free exploitation of non-infringing goods. One of those restraints may be the threat of an infringement suit, as communicated in a cease-and-desist letter. Thus, Red Wing's argument that its claim arises out of HHI's contacts with Minnesota has at least some merit.

Even so, this court has stated that, without more, such letters are not sufficient to satisfy the requirements of Due Process in declaratory judgment actions. *See Genetic Implant Sys. Inc. v. Core–Vent Corp.*, 123 F.3d 1455, 1458, 43 USPQ2d 1786, 1789 (Fed.Cir.1997). Given the potentially direct relationship between such letters and a declaratory judgment action, this statement begs for an explanation.

Some lower courts provide an explanation by analyzing the claim as the mirror image of the declaratory judgment action, in essence, ignoring its declaratory posture. In other words, these courts analyze the claim as if it were simply an infringement action brought by the patentee. *See, e.g., Zumbro, Inc. v. California Natural Prods.*, 861 F.Supp. 773, 780, 32 USPQ2d 1650, 1656 (D.Minn.1994); *Amway Corp. v. Kope Food Prods.*, 840 F.Supp. 78, 81, 30 USPQ2d 1380, 1383 (W.D.Mich.1993). Under this analysis, the infringement claim arises out of instances of making, using, or selling the patented invention. The infringement claim does not arise out of cease-and-desist letters, which bear only a tangential relationship to this view of the claim. Thus, this mode of analysis provides a rationale for discounting the impact of cease-and-desist letters alone. Moreover, this court views a declaratory judgment claim in this manner for other purposes, such as determining whether the claim "arises under" the patent laws. *See Speedco, Inc. v. Estes*, 853 F.2d 909, 912, 7 USPQ2d 1637, 1640 (Fed.Cir.1988).

On the other hand, this mode of analysis overlooks the genuine purpose of declaratory judgment actions. In the event a patentee casts its net of cease-and-desist letters too widely and entangles some non-infringing products, a plaintiff may have little recourse other than a declaratory judgment action to disentangle its non-infringing business. In those instances, the cease-and-desist letters are the cause of the entanglement and at least partially give rise to the plaintiff's action. In sum, the mirror-image analysis does not account for the legitimate use of a declaratory judgment action as a disentanglement tool. Thus, it ignores the essential fact that in a declaratory judgment action, the patentee is, after all, the defendant.

A better explanation for this court's statement that cease-and-desist letters alone do not suffice to create personal jurisdiction lies in the second prong of the traditional Due Process inquiry. This prong examines whether the maintenance of personal jurisdiction would "comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174 (quoting *International Shoe*, 326 U.S. at 320, 66 S.Ct. 154). Thus, even though cease-and-desist letters alone are often substantially related to the cause of action (thus providing minimum contacts), the "minimum requirements inherent in the concept of 'fair play and substantial justice' . . . defeat the reasonableness of jurisdiction." *Id.* at 477–78, 105 S.Ct. 2174. Principles of fair play and substantial justice afford a patentee sufficient latitude to inform others of its patent rights without subjecting itself

to jurisdiction in a foreign forum. A patentee should not subject itself to personal jurisdiction in a forum solely by informing a party who happens to be located there of suspected infringement. Grounding personal jurisdiction on such contacts alone would not comport with principles of fairness. *See Asahi,* 480 U.S. at 121–22, 107 S.Ct. 1026 (Stevens, J., concurring in judgment).

Moreover, an offer for a license within a cease-and-desist letter does not somehow convert that letter into something more than it was already. *Cf. Akro,* 45 F.3d at 1548 (discussing such hybrid letters). An offer to license is more closely akin to an offer for settlement of a disputed claim rather than an arms-length negotiation in anticipation of a long-term continuing business relationship. *See Burger King,* 471 U.S. at 479, 105 S.Ct. 2174 (distinguishing between negotiations that come to fruition and create continuing obligations and those that do not). Treating such hybrid cease-and-desist letters differently would also be contrary to fair play and substantial justice by providing disincentives for the initiation of settlement negotiations.

The policy favoring settlement is manifest in, among other places, the Federal Rules of Evidence. The Rules provide that evidence of "promising to accept . . . a valuable consideration in . . . attempting to compromise a claim" is not admissible "to prove liability" for the claim. *See* Fed.R.Evid. 408. Nor is "evidence of conduct or statements made in compromise negotiations." *Id.* Although the Rules do not explicitly make evidence of such negotiations inadmissible to establish personal jurisdiction, the policy underlying the Rules supports an approach that fosters settlement of infringement claims. Indeed, this policy squarely invokes one of the considerations enumerated by the Supreme Court for the second prong of a proper Due Process analysis, namely, "the interstate judicial system's interest in obtaining the most efficient resolution of controversies." *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559; *see also Digi–Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.,* 89 F.3d 519, 524 (8th Cir.1996) ("[C]ourts have hesitated to use unsuccessful settlement discussions as 'contacts' for jurisdictional purposes.").

In this case, HHI sent three warning letters. Shortly after receipt of the third letter, Red Wing filed its declaratory judgment claim. As this court has stated before, cease-and-desist letters alone do not suffice to justify personal jurisdiction. Specifically, such letters cannot satisfy the second prong of the Due Process inquiry. Standards of fairness demand that HHI be insulated from personal jurisdiction in a distant foreign forum when its only contacts with that forum were efforts to give proper notice of its patent rights. HHI's three letters alone do not create personal jurisdiction in Minnesota.

■ HHI's licensees have extensive contacts with Minnesota, but this additional factor is also insufficient to submit HHI to personal jurisdiction in the state. In simple terms, doing business with a company that does business in Minnesota is not the same as doing business in Minnesota. Indeed, as stated above, the Supreme Court has made clear that contacts resulting from "the unilateral activity of another party or third person" are not attributable to a defendant. *See Burger King,* 471 U.S. at 475 & n. 17, 105 S.Ct. 2174 (citing *World–Wide Volkswagen,* 444 U.S. 286, 100 S.Ct. 559 (no jurisdiction over an out-of-state automobile distributor whose only tie to the forum resulted from a customer's decision to drive there); *Kulko v. California Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (no jurisdiction over a divorced husband being sued for child-support payments whose only affiliation with the forum was created by his former spouse's decision to settle there); *and Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (no jurisdiction over a trustee whose only connection with the forum resulted from the settlor's decision to exercise her power of appointment there)). Red Wing's flawed theory would subject a defendant to nationwide personal jurisdiction if it decides to do business with a company that does business nationwide.

■ HHI's receipt of royalty income from its licensees for sales made in Minnesota is equally irrelevant. "[F]inancial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a consti-

tutionally cognizable contact with that State." *World–Wide Volkswagen,* 444 U.S. at 299, 100 S.Ct. 559. Because the contacts of HHI's licensees with Minnesota are not "constitutionally cognizable" for purposes of jurisdiction over HHI, any financial benefits accruing to HHI from its licensees' relations with Minnesota are irrelevant.

Red Wing's attempt to describe HHI's licensees as a "distribution channel" in order to invoke a "stream of commerce" theory also falls short. *Cf. Viam Corp. v. Iowa Export–Import Trading Co.,* 84 F.3d 424, 38 USPQ2d 1833 (Fed.Cir.1996) (recognizing and applying the "stream of commerce" theory). HHI's product is a covenant not to sue, not a shoe incorporating the patented technology. As such, HHI's product never enters the stream of commerce. The products of HHI's licensees may do so, but HHI has no control over their activities. The licensees are not HHI's agents. Thus, the "stream of commerce" theory is inapplicable in this case.

Finally, the decision in this case is properly distinguishable from this court's decision in *Akro.* As in this case, *Akro* involved a declaratory judgment action filed against a patentee who produced and sold no tangible products. Moreover, the declaratory judgment action in *Akro* also was precipitated by a cease-and-desist letter sent into the forum state and subsequent negotiations for settlement. *See Akro,* 45 F.3d at 1542. Nevertheless, in that case, this court held that the patentee was constitutionally amenable to suit in the forum state, finding "specific jurisdiction" because the patentee had substantial contacts with an exclusive licensee who was incorporated and had its principal place of business there. *See id.* at 1543.

This court in *Akro,* however, did not attribute the licensee's contacts to the patentee, as Red Wing seeks to do in this case. Rather, the focus in *Akro* was on the patentee's contacts with the forum and its residents, namely, the patentee's contacts with its exclusive licensee. This court emphasized the exclusive nature of the license, stating that "the exclusivity of [the] license agreement ... created continuing obligations" between the patentee and the forum and "eliminated any possibility of [the patentee's] entering into any type of licensing arrangement" with the declaratory judgment plaintiff. *Id.* at 1546. Thus, the fact that the licensee had contacts with the forum state was relevant only to the extent that it showed the licensee to be a resident thereof. What was critical was that the patentee had contacts with that resident in the forum state.

*Akro* also addressed the relationship between the patentee's contacts with the licensee and the declaratory judgment cause of action. This court suggested that although the cause of action did not "arise out of" these contacts, it did "relate to" them. *See id.* at 1547, 1549. Among other things, the license agreement required the patentee to defend and pursue any infringement actions involving the licensed patent—which was also the patent in suit. *See id.* at 1543. In light of the patentee's substantial contacts with its exclusive licensee, this court determined that the patent was a sufficient nexus between the contacts and the cause of action to establish "specific jurisdiction." *See id.* at 1549.

In contrast, none of HHI's licensees reside in Minnesota; to the extent any of them may be considered Minnesota residents, HHI had no dealings with them there. Moreover, none of HHI's licenses requires it to defend or pursue infringement actions involving the '895 patent, nor requires HHI to be so nearly involved with its licensees as was the case with the exclusive licensee in *Akro.* In sum, either the activities of HHI are not directed at Minnesota or the activities focused on are not those of HHI.

## IV.

Accordingly, for the reasons set forth above, this court affirms the judgment of the United States District Court for the District of Minnesota.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*